1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JINHUA MENG, et al.,

              Plaintiffs,

        v.

ESSEX PROPERTY TRUST, INC., et
al.,

              Defendants.

CASE NO. C14-1227JLR

ORDER DENYING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.    INTRODUCTION

Before the court are Defendants Essex Property Trust, Inc., doing business as

Essex Property, Inc., and Essex Management Corporation's (collectively, "Essex")

motion for summary judgment (Mot. (Dkt. # 19)), Plaintiffs Jinhua Meng ("Mr. Meng")

and Taoyun Lian's ("Ms. Lian") opposition thereto (Resp. (Dkt. # 26)), and Essex's reply

memorandum (Reply (Dkt. # 30)).  This is a negligence case in which Plaintiffs seek

redress for injuries that Mr. Meng sustained when he fell from a swing located on Essex's

1   property.  (Compl. (Dkt. # 3).)  Essex moves for summary judgment on three bases:  (1)

2   Essex enjoys immunity under Washington's recreational use statute, RCW 4.24.200,

3   .210; (2) Plaintiffs cannot show that Essex breached a duty to Mr. Meng; and (3)

4   Plaintiffs cannot show that the alleged breach proximately caused Mr. Meng's injuries.

5   (Mot. at 2.)  The court has considered the motion, all submissions filed in support thereof

6   and opposition thereto, the balance of the record, and the relevant law.  Being fully

7   advised,[1] the court DENIES Essex's motion for summary judgment.

8   ## II.   BACKGROUND

9        In the early summer of 2013, Mr. Meng and his wife, Ms. Lian, were visiting

10   Seattle from their home in China.  (*See* Wampold Decl. (Dkt. # 29) ¶ 2, Ex. 16 ("Meng

11   Dep.") at 7:18-24; Mot. at 6.)  They were staying with their son, Yanfeng Meng

12   ("Yanfeng"), who was working as a radiologist and researcher in Seattle and living at the

13   Linden Square Apartments ("Linden Square") at 13530 Linden Avenue North, Seattle,

14   Washington, 98133.  (*See* Meng Dep. at 8:2-9:4; Wampold Decl. ¶ 2, Ex. 17 ("Yanfeng

15   Dep.") at 7:23-10:15; Compl. ¶ 1.2.)  On the morning of June 1, Mr. Meng got up at

16   around 7:30 a.m. and went for a walk around the neighborhood.  (Meng Dep. at 7:18-24,

17   10:10-11:10.)  When he returned, he decided to stop and "swing for a little bit" on one of

18   the swings at Linden Square before returning to his son's apartment for breakfast.  (*Id.* at

19   12:7-13:1.)  This decision would prove fateful:  immediately after sitting down on the

20   swing closest to the apartments, Mr. Meng tumbled backward off the swing, and his head

21   _____

22        [1] No party has requested oral argument, and the court finds oral argument unnecessary for disposition of this motion.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

ORDER- 2

1  struck the ground, paralyzing him from the neck down.  (*Id.* at 14:16-24, 17:18-23, 20:4-

2  10, 21:17-23; *see id.* at 44:12-45:7; Resp. at 8; Mot. at 3.)   Mr. Meng does not know

3  what caused him to fall.  (Meng Dep. at 21:24-22:7 ("Q: Do you know what caused you

4  to start tumbling backwards?  A: That I couldn't understand myself.").)

5         At the time of Mr. Meng's injury, Essex owned Linden Square.  (*See* Wampold

6  Decl. ¶ 2, Ex. 13 at 4-5; Harrison Decl. (Dkt. # 20) ¶ 2.)  Essex is a large real estate

7  investment trust with a portfolio of over 200 multifamily properties on the west coast.

8  (*See* Wampold Decl. ¶ 2, Ex. 2; Resp. at 3.)  It purchased Linden Square in 2000 and held

9  it until August 2013, not long after the incident at issue here.  (*See* Wampold Decl. ¶ 2,

10  Ex. 13 at 4-5; Harrison Decl. (Dkt. # 20) ¶ 2; Mot. at 2.)  Linden Square already had a

11  playground when Essex purchased it.  (Wampold Decl. ¶ 2, Ex. 13 at 4-5.)  In total, Essex

12  owns 75 playgrounds and "tot lots" spread out over 68 of its properties.  (*Id.* Ex. 1 at 3, 6-

13  7.)

14         The playground equipment involved in Mr. Meng's injury is a two-swing swing

15  set situated in a rectangular patch of woodchips next to a Linden Square building.[2]  (*See*

16  Newton Decl. (Dkt. # 28) ¶ 4, Exs. 1-7.)  The original builder of Linden Square installed

17  the swing set to comply with a permit condition requiring "two of the following three

18  play structures . . . : 1) a sandbox; 2) a swing set with at least one seat for toddlers; and 3)

19  a wood play structure with slides and ramps" in order to "mitigate for recreation

20  

21         [2] The court will refer to the swing set and swing at issue here as "the swing set" and "the
22  swing," respectively, but will refer to the area around the swing set, including the swing set
   itself, as "the playground."

impacts." (Krashan Decl. (Dkt. # 21) ¶ 13, Ex. J ("Permit Analysis") at 14; *see also id.* at 12; Krashan Decl. ¶ 12, Ex. I ("Permit Application") at 13.) Since acquiring Linden Square, Essex has used the presence of the playground in advertising to prospective tenants. (*See* Wampold Decl. (Dkt. # 29) ¶ 2, Ex. 6.) The parties dispute whether Essex has allowed non-tenants to use the playground.

In addition, the parties dispute certain details concerning the condition of the playground on June 1, 2013. It is undisputed, however, that the swing seat was not installed according to the manufacturer's instructions. (*See* Wampold Decl. ¶ 2, Ex. 7 ("Linville Dep.") at 50:2-52:20; *id.* Ex. 5 ("Green Report") at 1-2; *id.* Ex. 10 ("Iverson Dep.") at 35:5-36:10.) Those instructions provided that the seats should connect to a chain on each side of the seat via a shackle[3]—a u-shaped metal device with a bolt running through the gap at its top. (*See* Linville Dep. at 50:2-52:20; Iverson Dep. at 35:5-36:10; Wampold Decl. ¶ 2, Ex. 11 ("Ching Report") at 4.) To connect a chain to one side of a swing seat, the bolt should be removed from the shackle, one arm of the shackle should then be threaded through the hole on the side of the seat, and the bolt should be reinserted so as to pass through the last link on the chain. (*See id.*) Rather than following this procedure, whoever installed the swings at Linden Square forced the chains through the holes in the seats and attached the shackles to the end of the chains

---

[3] At various points in the record, the parties and some of their witnesses refer to this device as a "clevis" or "bolt link." (*See, e.g.*, Linville Dep. at 52:2-12 ("clevis"); Green Report at 1 ("bolt link").)

underneath the seats.  (*See id.*; *see also* Green Report at 2; Newton Decl. ¶¶ 4, 6, Ex. 7.)

The parties dispute whether this arrangement caused the swing to be unstable.[4]

Plaintiffs further contend that the swing's seat was 29-30 inches from the ground

and that only 2.5-3 inches of uncompressed fill material covered the ground beneath the

swing.  (*See* Resp. at 5, 12-14.)  Essex disputes this contention on the basis that no

measurements were taken on the day of the fall.  (*See* Mot. at 15-16.)  Nevertheless, on

June 15, 2015, Paul Newton, a friend of Yangfeng's, visited the playground and

measured the swing seat at roughly 29 inches above the ground.  (Newton Decl. ¶¶ 3-4,

7-10, Ex. 8.)[5]  Subsequent measurements by Plaintiffs' experts in September 2013 and

again in December 2014, revealed that the swing seat was 29 inches above the ground

and that approximately 2 inches of wood chips lay beneath the swing.  (Wampold Decl. ¶

2, Ex. 12 ("Iverson Report") at 1; Iverson Dep. at 11:21-12:5, 13:22-14:4; Green Report

at 1.)  For a swing like the one from which Mr. Meng fell, published national playground

safety standards require at least 9 inches of compressed wood chips.  (Iverson Report at

1; Wampold Decl. ¶ 2, Ex. 19 ("CPSC Handbook") at 3-5; *see also* Wampold Decl. ¶ 2,

---

[4] In particular, Plaintiffs' playground safety experts opine that the improper attachment made the swing seat unstable (*see* Iverson Report at 1; Green Report at 1), while Essex attacks those opinions and offers evidence that, although people used the swings at Linden Square, Essex never received reports that it was unstable or in any way unsafe (Mot. at 14-15; Krashan Decl. ¶ 3, Ex. B ("Harrison Dep.") at 25:19-26:6, 34:9-17, 42:6-20).  *See infra* Part III.C.1.

[5] Mr. Newton had previously been to the playground on June 3, 2015, two days after Mr. Meng's fall.  (Newton Decl. ¶ 4.)  He did not take measurements during that visit (*id.* ¶ 8), but the height of the swing seat surprised him (*id.* ¶ 7).  When he returned on June 15, 2015, he observed that the playground appeared to be in the same condition as it was on June 3, and in particular, that the "wood chips did not seem to be dispersed or spread out in any different fashion."  (*Id.* ¶ 9.)

1  Ex. 20 ("ASTM Standards") at 1, 19.[6]  Although the published standards say nothing

2  about a maximum height for swing seats, one of Plaintiffs' playground safety experts,

3  MaryLou Iverson, opines that 16 inches is the standard.  (Iverson Dep. at 29:4-19;

4  Iverson Report at 1; *see* CPSC Handbook at 29; ASTM Standards at 12, 40.)

5      Essex has almost no maintenance records related to the swing set.  (*See* Wampold

6  Decl. ¶ 2, Ex. 15 ("Humiston Dep.") at 23:25-27:10.)  A former Linden Square

7  maintenance manager, Gregory Mitchell, testifies that during his tenure he routinely

8  inspected the swing set but never performed maintenance on it other than painting it.  (*Id.*

9  Ex. 14 ("Mitchell Dep.") at 10:11-13, 12:7-16, 13:22-14:23.)[7]  Moreover, Essex's

10  corporate representative,[8] Richard Humiston, testifies that Essex provided maintenance

11  personnel with no training in playground safety (Humiston Dep. at 36:4-22), and Mr.

12  Mitchell confirms that he received no such training (Mitchell Dep. at 18:14-22).

13      The record indicates Essex likewise performed almost no maintenance on the

14  playground surface.  Indeed, the only evidence in the record of such maintenance pertains

15  to a single occasion in 2012 when Essex added some woodchips to fill holes left by a

16

17  [6] The "CPSC Handbook" is the United States Consumer Product Safety Commission
Handbook for Public Playground Safety.  (*See* CPSC Handbook.)  The "ASTM Standards" are
the American Society for Testing and Materials' Standard Consumer Safety Performance

18  Specification for Playground Equipment for Public Use.  (*See* ASTM Standards at 1.)  The
ASTM Standards "establish[] the nationally recognized safety standards for public playground

19  equipment to address injuries identified by the [CPSC]."  (*Id.*)

20  [7] Mr. Mitchell also testifies that at some point he sat on the swing and did not notice
anything troubling about the swing.  (Mitchell Dep. at 27:20-28:5.)  Another Essex employee,

21  Colin Cramer, looked at the swing set on one occasion, "touch[ed] the sides," and found that it
was stable and secure.  (Krashan Decl. ¶ 6, Ex. E ("Cramer Dep.") at 21:12-25.)

22  [8] *See* Fed. R. Civ. P. 30(b)(6).

1    removed piece of playground equipment.  (*See* Humiston Dep. at 53:12-54:6.)  Mr.

2    Humiston states that on this occasion Essex was concerned with cosmetics and

3    convenience, not with ensuring adequate fill for safety purposes.  (*Id.* at 54:2-55:2.)

4         Plaintiffs filed this lawsuit on July 9, 2014, in King County Superior Court

5    alleging a single cause of action against Essex for negligence on a theory of premises

6    liability.  (Compl. at 1, ¶¶ 3.1-4.2.)  In particular, Plaintiffs allege that Essex was

7    responsible for maintaining the playground in a reasonably safe condition; that Essex

8    breached this duty insofar as the swing was improperly installed, the swing was too high,

9    and the fill material beneath the swing was inadequate; and that this breach caused Mr.

10   Meng to fall from the swing and injure his spine.  (*Id.*)  Essex removed the case to this

11   court on August 8, 2014.  (Not. of Rem. (Dkt. # 1).)  On June 30, 2015, Essex filed the

12   instant motion for summary judgment.  (Mot. at 1.)  Essex's motion requests judgment as

13   a matter of a law on the grounds that (1) it has immunity under RCW 4.24.210,

14   Washington's recreational use statute; (2) Plaintiffs cannot establish the breach of any

15   duty to Mr. Meng; and (3) Plaintiffs cannot establish that any alleged breach proximately

16   caused Mr. Meng's injuries.  (*Id.* at 2.)  Essex's motion is now before the court.

## III.    DISCUSSION

**A.    Summary Judgment Standard**

19        Summary judgment is appropriate if the evidence shows "that there is no genuine

20   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

21   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.*

22   *Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

1  outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

2  factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact

3  finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,

4  992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

5          The moving party bears the initial burden of showing there is no genuine issue of

6  material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S.

7  at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

8  show the absence of an issue of material fact in two ways:  (1) by producing evidence

9  negating an essential element of the nonmoving party's case, or (2) by showing that the

10 nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan*

11 *Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving

12 party will bear the ultimate burden of persuasion at trial, it must establish a prima facie

13 showing in support of its position on that issue.  *UA Local 343 v. Nor-Cal Plumbing, Inc.*,

14 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that,

15 if uncontroverted at trial, would entitle it to prevail on that issue.  *Id*. at 1473.  If the

16 moving party meets its burden of production, the burden then shifts to the nonmoving

17 party to identify specific facts from which a fact finder could reasonably find in the

18 nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

19         The court is "required to view the facts and draw reasonable inferences in the light

20 most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

21 The court may not weigh evidence or make credibility determinations in analyzing a

22 motion for summary judgment because these are "jury functions, not those of a judge."

1  *Anderson*, 477 U.S. at 249-50.   Furthermore, the court may consider as evidence only

2  materials that are capable of being presented in an admissible form.  *See* Fed. R. Civ. P.

3  56(c)(2); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

4  **B.      Immunity Under Washington's Recreational Use Statute**

5          Essex contends that it is immune from Plaintiffs' lawsuit under Washington's

6  recreational use statute, RCW 4.24.400, .410.  (*See* Mot. at 6-11.)  That statute was

7  "intended to modify the common law duty owed to public invitees so as to encourage

8  landowners to open their lands to the public for recreational purposes."  *Davis v. State*, 30

9  P.3d 460, 462 (Wash. 2001) (citing RCW 4.24.200).  To that end, RCW 4.24.210(1)

10 provides:

> "[A]ny public or private landowners . . . or others in lawful possession and
> control of any lands . . . who allow members of the public to use them for
> the purposes of outdoor recreation . . . without charging a fee of any kind
> therefor, shall not be liable for unintentional injury to such users."

13 RCW 4.24.210(1).  The landowner-defendant bears the burden of proving that the

14 immunity applies to it.  *See Cregan v. Fourth Mem'l Church*, 285 P.3d 860, 863 (Wash.

15 2012) (citing RCW 4.24.210(1)).

16         The parties dispute several elements of the immunity, including whether Essex has

17 shown the absence of a genuine dispute of material fact concerning whether the

18 playground was open to the public.  (*See* Mot. at 7-8; Resp. at 16-20.)  In analyzing the

19 open-to-the-public requirement under RCW 4.24.210(1), the Washington Supreme Court

20 has held, "'[P]ublic' means '[o]pen or available to for all to use, share, or enjoy.'"

21 *Cregan*, 285 P.2d at 863 (alterations in original) (quoting Black's Law Dictionary 1348

22

1    (9th ed. 2009)); *see also id.* at 864 (finding a camp not open to the public because "not

2    everyone in the community had the same opportunity to enter and use the property").

3    "The facts surrounding access are viewed objectively." *Id.* at 864.  Here, the court finds

4    that a genuine dispute of material fact remains regarding whether the playground was

5    open to the public.[9]

6         The record contains few facts relevant to the question of whether the playground

7    was open to the public.  Christine Rook, who was the property manager at Linden Square

8    through July 2012, testifies that on two occasions she removed from the premises non-

9    resident children who were using the swing set.  (Wampold Decl. ¶ 2, Ex. 21 ("Rook

10   Dep.") at 35:3-6, 46:21-47:7 ("Q:  . . . Were they allowed to be on the swing if they

11   didn't live there?  A:  No, they were escorted off the property by myself.").)  On the other

12   hand, Jessica Harrison, the property manager during June 2013, testifies that Essex had

13   no official policy or procedure, fence, or signs restricting use of the playground to

14   residents.  (Harrison Decl. ¶¶ 2-4.)  She contrasts this with the swimming pool at Linden

15   Square, the use of which a fence, signs, and Essex official policy restricted to residents.

16   (*Id.* ¶ 5.)

17        These facts are equivocal with respect to whether the playground was open to the

18   public.  Viewing the facts and drawing all reasonable inferences in Plaintiffs' favor, a

19   rational jury could conclude that the playground was not open to the public and that

20   Essex is therefore not entitled to recreational use immunity.  *See Scott*, 550 U.S. at 378;

21

22        [9] As such, the court does not address any other aspects of the immunity or its exceptions.
     *See generally Davis*, 30 P.3d at 462.

1  *Cregan*, 285 P.2d at 863 (holding that the landowner-defendant bears the burden of

2  proving that he or she is entitled to recreational use immunity).  Accordingly, summary

3  judgment is inappropriate on this issue.  *See Celotex*, 477 U.S. at 324.

4          The court rejects Essex's arguments for a contrary interpretation of the evidence.

5  For instance, Essex argues that the court should ignore Ms. Rook's testimony because she

6  was the manager through July 2012, but not in 2013 when Mr. Meng was injured.  (*See*

7  Mot. at 5 n.34.)  The court, however, finds Ms. Rook's testimony relevant.  *See* Fed. R.

8  Evid. 401; *United States v. Hankey*, 203 F.3d 1160, 1170 (9th Cir. 2000) (stating that

9  "[r]emoteness, which is often an important variable in the relevance equation," is an issue

10 that is generally "left up to the commonsense of the trial judge").  While the jury could

11 permissibly discount Ms. Rook's testimony on the basis of remoteness, they would not be

12 required to do so.[10]  *See Scott*, 550 U.S. at 378.  More to the point, the court will not

13 disregard Ms. Rook's testimony here, where the court must view all facts in the light

14 most favorable to Plaintiffs and draw all reasonable inferences in Plaintiffs' favor.  *See*

15 *id.*; *Anderson*, 477 U.S. at 249-50.  A jury could reasonably rely on Ms. Rook's

16 testimony and find that Essex had not met its burden of demonstrating that the

17 playground was open to the public.

18         Additionally, Essex contends that the City of Seattle required the playground to be

19 open to the public, and that such a requirement has special significance in the recreational

20

21     [10] Nor would the jury be required to credit Ms. Harrison's testimony or, even if they did
credit her testimony, to decide that the playground was open to the public on the basis that Essex
22 lacked an official corporate policy restricting the playground to residents.  *See Cregan*, 285 P.2d
at 864 ("The facts surrounding access are viewed objectively.").

ORDER- 11

immunity analysis.  (*See* Mot. at 7-8.)  In support of this position, Essex cites to the

permit conditions for Linden Square and to *Gaeta v. Seattle City Light*, 774 P.2d 1255

(Wash. Ct. App. 1989).  (*Id.*)  Essex, however, has exaggerated both the facts and the

law.  The Linden Square permit conditions do not explicitly require the playground to be

open to the public[11] (*see* Permit Analysis at 14; *see also id.* at 12; Permit Application at

13); and nothing in *Gaeta* gives special significance to external requirements that land be

open to the public, *see Gaeta*, 774 P.2d at 1258 (rejecting the argument that an external

open-to-the-public requirement defeats the immunity and stating that such a requirement

"is of no consequence").  Indeed, even if the permit conditions contained such a

requirement, it would constitute only circumstantial evidence that the playground was in

fact open to the public.  *See Cregan*, 285 P.2d at 863 ("The facts surrounding access are

viewed objectively.").  The requirement would not support Essex's position unless the

court inferred that Essex abided by the requirement, which, at summary judgment, the

court could not do, particularly on the current record.  *See Scott*, 550 U.S. at 378;

(*compare* Permit Analysis at 14 (requiring "two . . . play structures") *with* Humiston Dep.

at 57:23-60:18 (discussing Essex's removal in 2012 of the second piece of playground

equipment, a jungle gym, despite the Linden Square permit conditions).

Finally, Essex cites to the testimony of Ms. Harrison and Marco Subero, a former

Linden Square maintenance technician, as proof that non-residents used the playground.

---

[11] Nor would it be unreasonable for a jury to conclude that the permit conditions do not implicitly require the playground to be open to the public.  (*See* Permit Analysis at 14; *see also id.* at 12; Permit Application at 13.)

1   (*See, e.g.*, Reply at 3-4.)  Yet in the cited passages Ms. Harrison and Mr. Subero do not

2   state that non-residents used the playground.  Ms. Harrison states only that children used

3   the playground and that they may have been residents or non-residents but that she did

4   not pay attention.  (Harrison Dep. at 25:19-26:6.)  Mr. Subero testifies similarly.  He

5   states that he observed children on the swings, but he does not specify whether those

6   children were residents or not.  (Krashan Decl. ¶ 4, Ex. C ("Subero Dep.") at 41:13-

7   42:23.)

8       In sum, the court concludes that a genuine dispute of material fact exists

9   concerning whether the playground was open to the public.  The court therefore denies

10  Essex's motion insofar as it seeks immunity under Washington's recreational use statute.

11  *See Celotex*, 477 U.S. at 324; *Cregan*, 285 P.2d at 863-64.

12  **C.    Plaintiffs' Washington Premises Liability Claim**

13      Proceeding to the merits of Plaintiffs' case, Essex asserts that Plaintiffs have

14  insufficient evidence to prove liability for negligence on a theory of premises liability.

15  (*See* Mot. at 12.)  A cause of action for negligence requires the plaintiff to establish "(1)

16  the existence of a duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a

17  proximate cause between the breach and the injury."  *Pedroza v. Bryant*, 677 P.2d 166,

18  168 (Wash. 1984).  According to premises liability theory, a landowner owes an

19  individual a duty of care based on the individual's status (invitee, licensee, or trespasser)

20  upon the land.  *Curtis v. Lein*, 239 P.3d 1078, 1081 (Wash. 2010).  For purposes of this

21  motion, the parties agree that Mr. Meng was an invitee.  (*See* Resp. at 9; Mot. at 12.)

22

1    Washington has adopted sections 343 and 343A of the *Restatement (Second) of*

2    *Torts* to define a landowner's duty to invitees.  *Kamla v. Space Needle Corp.*, 52 P.3d

3    472, 477 (Wash. 20002).  The Restatement provides that a possessor of land is subject to

4    liability for physical harm caused to his invitees by a condition on the land only if the

5    possessor "(a) knows or by the exercise of reasonable care would discover the condition,

6    and should realize that it involves an unreasonable risk of harm to such invitees, and (b)

7    should expect that they will not discover or realize the danger, or will fail to protect

8    themselves against it, and (c) fails to exercise reasonable care to protect them against the

9    danger."  *Id.* (quoting *Restatement (Second) of Torts* § 343).  Essex challenges Plaintiffs'

10   ability to prove (1) that an unreasonably dangerous condition existed, (2) that Essex

11   would have discovered the alleged condition through the exercise of reasonable care, and

12   (3) that Essex's failure to discover the alleged conditions proximately caused Mr. Meng's

13   injury.  (*See* Mot. at 12.)

14       1.  Dangerous condition

15       Plaintiffs identify several aspects of the playground that they assert were

16   unreasonably dangerous—namely, improper attachment of the swing seat to the chains,

17   instability of the swing seat, excessive height of the swing seat, and inadequate fill

18   beneath the swing seat.  (*See* Resp. at 4-6, 9, 11-12, 14.)  These aspects are interrelated.

19   Plaintiffs assert that improper attachment of the swing seat to the chains made the swing

20   seat unstable and caused it to be higher off the ground.  (*Id.* at 4.)  Similarly, Plaintiffs

21   contend that if Essex had placed the proper amount of fill beneath the swing, the

22   additional fill would have raised the level of the ground beneath the swing thereby

1    reducing the height of the swing.  (*Id.* at 4.)  Plaintiffs contend that if Essex had remedied

2    any of these issues, Mr. Meng would not have been injured.  (*Id.* at 12.)

3         Plaintiffs have adduced evidence sufficient to survive summary judgment that an

4    improperly installed seat and inadequate fill constitute unreasonably dangerous

5    conditions that existed at the time of Mr. Meng's fall.  *See Celotex*, 477 U.S. at 324;

6    *Kamla*, 52 P.3d at 477.  To begin, Plaintiffs offer Mr. Newton's declaration and

7    accompanying photographs.  Mr. Newton visited the playground two days after Mr.

8    Meng's injury and again 14 days after the injury.  (Newton Decl. ¶¶ 4, 9.)  During his

9    first visit, Mr. Newton took general photographs of the playground and was surprised

10   both by the height of the swing and what he saw as the unusual manner in which the seat

11   was attached to the chain—that is, with a shackle attached to the chain underneath the

12   seat.  (*Id.* ¶¶ 4-7, Exs. 1-7.)  When he returned 12 days later, Mr. Newton measured the

13   swing's height at 29.75 inches.  (*Id.* ¶¶ 9-10, Ex. 8.)  He noted that the wood chips

14   underneath the swing did not appear to have been dispersed between his visits, indicating

15   that the swing's height had not changed since his first visit.  (*See id.* ¶ 9.)

16        In addition, Plaintiffs retained the services of MaryLou Iverson, a playground

17   safety expert.  (*See* Iverson Report.)  Ms. Iverson conducted inspections of the

18   playground on September 30, 2013, and November 18, 2014.  (*Id.* at 1.)  She observed

19   that the swing seat was improperly attached to the chains, making it sit higher off the

20   ground and rendering it unstable.  (*Id.* at 1-2.)  She also measured the swing seat's

21   distance from the ground at 29 inches with a person sitting in the seat.  (*Id.* at 1.)  She

22   opined that such distance was "too high" and above the industry standard of 16 inches.

ORDER- 15

1    (*Id.*)  Upon inspecting the fill beneath the swing, she found that it was only 2 inches deep

2    and that the top layer consisted of poor quality wood chips.  (*Id.* at 1-2.)  She opined that

3    the "combination of the insufficient depth of the surfacing material in conjunction with

4    the incorrectly affixed seat resulted in an unstable seat that was too high above a surface

5    with dramatically reduced fall protection."  (*Id.* at 2.)

6         Another playground expert, Professor Paul Green, inspected the playground on

7    November 25, 2014, and March 4, 2015.  (Green Report at 1.)  He noted that the seat was

8    of the wrong model for the swing set, that the seat was improperly attached, and that

9    there were only two inches of fill beneath the swing.  (*Id.* (citing CPSC Handbook).)  He

10   opined that "[t]hese safety faults made the swing an extreme hazard to users."  (*Id.*)  In

11   particular, Professor Green stated that, in his opinion, the incorrect attachment caused the

12   seat to "act[] like a dump truck" that can "drop the user off the back of the seat."  (*Id.*; *see*

13   *also* Green Dep. at 70:22-71:17.)

14        Essex argues that Plaintiffs cannot survive summary judgment on the basis of this

15   evidence.  (*See* Mot. at 13-17.)  First, Essex asks the court to exclude under Federal Rule

16   of Evidence 702 the testimony of Professor Green and Ms. Iverson that the swing was

17   unstable.  (*Id.* at 14-15.)  Exclusion is appropriate, Essex argues, because neither

18   Professor Green nor Ms. Iverson used a reliable scientific method to reach an opinion

19   about the swing's stability.  (*Id.* at 15.)  Essex does not contest, however, that Professor

20   Green and Ms. Iverson are playground safety experts.  (*See id.* at 14 (referring to

21   Professor Green and Ms. Iverson as "playground safety experts").)  Moreover, in its

22   reply, Essex acknowledges that an expert may draw conclusions from personal

observations made in light of the expert's specialized experience and expertise.  (Reply at

9 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156-57 (1999).)  On the record

before the court, the opinions at issue here appear to have formed in that manner—

Professor Green and Ms. Iverson, both experts in playground safety, visited Linden

Square and observed the stability of the swing in light of their experience and expertise.

(*See* Green Report at 3; Green Dep. at 35:10-21, 70:22-71:17; Iverson Report at 1, 4-6;

Iverson Dep. at 39:6-24.)  Rule 702 does not preclude the court from considering

opinions produced in this fashion.  *See Kumho Tire Co.*, 526 U.S. at 150, 156-57;

*Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

Therefore, the court finds that it may consider Professor Green's and Ms. Iverson's

opinions in deciding this motion.[12]

Next, Essex contends that even if the court considers Professor Green's and Ms.

Iverson's opinions, those opinions show nothing about the stability of the swing when

Mr. Meng sat on it.  (Mot. at 15.)  Essex is incorrect on this point as well.  Although

some time elapsed between Mr. Meng's fall and Professor Green's and Ms. Iverson's

inspections (*see* Green Report at 1; Iverson Report at 1), nothing in the record shows that

the condition of the swing seat changed in any way during that time.  To the contrary, the

---

[12] In the context of this motion, the parties' treatment of issues related to expert testimony has been perfunctory at best, enabling the court to reach only a preliminary ruling on these issues.  The parties have raised similar—and in some cases, identical—issues with more thoroughness in their recently filed motions in limine.  (*See* Pltf. MILs (Dkt. # 31) at 3-13; Def. MILs (Dkt. # 33) at 7-18.)  The court notes, therefore, that its consideration of expert opinions for purposes of the present motion for summary judgment is without prejudice to any of the motions in limine or the ultimate determination of admissibility at trial.

1  record contains evidence from which a reasonable jury could infer that little or no change

2  occurred.  *See Scott*, 550 U.S. at 378; *see also Hankey*, 203 F.3d at 1170 (stating that

3  "[r]emoteness, which is often an important variable in the relevance equation," is an issue

4  that is generally "left up to the commonsense of the trial judge").  For instance,

5  photographic evidence indicates that the attachment of the swing seat to the chains was

6  the same two days after Mr. Meng's fall as it was in late 2014 or early 2015.  (*See*

7  Newton Decl. ¶¶ 4, 6, Ex. 7; Green Report at 1-2.)  Moreover, contrary to Essex's

8  assertions, a jury could reasonably view Mr. Meng's deposition testimony about what

9  happened just before he fell as consistent with an unstable swing seat.[13]

10        Turning to the height of the swing, Essex urges the court to exclude Plaintiffs'

11  evidence because the measurements on which Plaintiffs rely were taken after the date of

12  the injury.  (*See* Mot. at 15-16.)  While Essex is free to highlight this issue at trial as a

13  reason for discounting Plaintiffs' evidence, the difference in time goes to weight, not

14  admissibility.  *See* Fed. R. Evid. 401; *Hankey*, 203 F.3d at 1170.  Mr. Newton measured

15

---

16      [13] Essex characterizes Mr. Meng's deposition testimony as showing that "the seat was
stable when he sat on it."  (Mot. at 2, 14-15 (citing Meng Dep. at 20:4-5 ("Q: Were you stable on
17  the seat before you fell?  A: Yes, I was steady. . . . .")).)  The court cannot adopt Essex's
interpretation of Mr. Meng's testimony here.  *See Scott*, 550 U.S. at 378.  Viewing Mr. Meng's
18  testimony as a whole and in the light most favorable to Plaintiffs, a jury could reasonably find
that Mr. Meng was not stable on the seat but immediately began tumbling backward after sitting
19  down.  (*See* Meng Dep. at 20:4-10 ("Q: Were you stable on the seat before you fell?  A: Yes, I
was steady.  When I sit down, I tumbled over.  Q: But before you tumbled over, was there a point
20  where you were stable on the seat?  A: Well, the minute I was sitting on the swing my head start
turn over."), 21:17-20 ("Q: How long were you on the swing before you started to fall?  A: I
21  didn't sit there long.  As soon as I'm sitting down, my head start tumbling."); *see also id.* at
17:18-23 ("Q:  So once your back was to the swing and you were touching it, what did you do
22  next to get into the swing.  A: So I just grab the chains and I started sitting down on the – on the
swing, and I just fell head down first.").)

ORDER- 18

1   the height of the swing only 14 days after the incident and testifies that the woodchips

2   beneath the swing did not appear to have dispersed since his first visit, two days after the

3   incident.  (Newton Decl. ¶¶ 4-5, 7-10, Ex. 8.)  Essex has presented no evidence that

4   anything changed before Mr. Newton's measurement or has changed since that time.  As

5   such, the court finds that it may consider Plaintiffs' evidence of the swing's height in

6   deciding this motion.[14]  *See Hankey*, 203 F.3d at 1170.

7       Essex further argues that Plaintiffs have failed to produce sufficient evidence

8   showing that the height of the swing was unreasonably dangerous.  (*See* Mot. at 16-17.)

9   The court disagrees.  Ms. Iverson states in her report and deposition that 16 inches is the

10   standard swing height and that this swing was "too high" at approximately 29 inches.

11   (Iverson Report at 1-2; Iverson Dep. at 42:1-16.)  Essex counters that neither the

12   published national standards nor the manufacturer's instructions state a maximum swing

13   height; however, that circumstance goes to the weight of Ms. Iverson's opinion, which is

14   an issue for trial, not summary judgment.  *See* Fed. R. Evid. 401; *Scott*, 550 U.S. at 378;

15   *Hangarter*, 373 F.3d at 1117 n.14 (noting that questions regarding the factual basis of an

16   expert's opinion go to the weight of the expert's testimony—an issue properly explored

17   during direct and cross-examination).  More to the point, a rational jury could conclude

18   that the swing's height was unreasonably dangerous upon hearing a playground safety

19

20       [14] The court also notes that measurements at the playground have remained consistent

21   from Mr. Newton's June 2013 visit (Newton Decl. ¶¶ 4-5, 7-10, Ex. 8), to Ms. Iverson's
    September 2013 inspection (Iverson Report at 1), and even up to Mr. Green's inspections in late

22   2014 and early 2015 (Green Report at 1).  This consistency suggests that the fill level and swing
    height are not as variable as Essex insists in its motion.

1    expert such as Ms. Iverson testify that the swing was "too high."  *See Scott*, 550 U.S. at

2    378.  Plaintiffs have therefore produced evidence sufficient to survive summary judgment

3    on the issue of whether the alleged dangerous conditions existed.

4        2.  <u>Constructive notice</u>

5        Defendants next challenge Plaintiffs' ability to prove that it had constructive

6    notice of the alleged dangerous conditions.  (Mot. at 17-19.)  As noted above, a

7    landowner may be liable for an injury sustained by an invitee from a dangerous condition

8    on the land only if the landowner had actual or constructive notice of the condition—that

9    is, if the landowner "knows or by the exercise of reasonable care would discover the

10   condition, and should realize that it involves an unreasonable risk of harm to such

11   invitees."  *Kamla*, 52 P.3d at 478 (quoting *Restatement (Second) of Torts* § 343);

12   *Ingersoll v. DeBartolo, Inc.*, 869 P.2d 1014, 1015 (Wash. 1994).  "The phrase

13   'reasonable care' imposes on the landowner the duty 'to inspect for dangerous conditions

14   . . . .'"  *Iwai v. State*, 915 P.2d 1089, 1094 (Wash. 1996) (alterations in original) (quoting

15   *Tincani v. Inland Empire Zoological Soc'y*, 875 P.2d 621, 631 (Wash. 1994)).

16   "Constructive notice arises where the condition 'has existed for such time as would have

17   afforded [the landowner] sufficient opportunity, in the exercise of ordinary care, to have

18   made a proper inspection of the premises and to have removed the danger.'"  *Ingersoll*,

19   869 P.2d at 1015 (quoting *Smith v. Manning's, Inc.*, 126 P.2d 44, 47 (Wash. 1942));

20   *Fredrickson v. Bertolino's Tacoma, Inc.*, 127 P.3d 5, 8 (Wash. Ct. App. 2005); *Kellett v.*

21   *Assembled Prods. Corp.*, No. C12-622RAJ, 2013 WL 3242526, at *3 (W.D. Wash. June

22   25, 2013); *Rodriguez v. U.S. Postal Serv.*, No. C07-1818 MJP, 2009 WL 210707, at *3

1  (W.D. Wash. Jan. 28, 2009).  Constructive notice is a factual issue that generally should

2  be decided by the jury.  *See Coleman v. Ernst Home Center, Inc.*, 853 P.2d 473, 476-77

3  (Wash. Ct. App. 1993).

4        Essex argues that Plaintiffs have "no facts" showing constructive notice.  (Mot. at

5  18.)  Essex, however, is mistaken.  Plaintiffs have presented evidence sufficient to create

6  a triable issue of fact regarding whether Essex should have discovered the playground's

7  condition and should have realized that it was unreasonably dangerous.  *See Celotex*, 477

8  U.S. at 324; *Ingersoll*, 869 P.2d at 1015; *Kellett*, 2013 WL 3242526, at *4.

9        To begin, the record contains evidence from which the jury could derive the

10  parameters of a reasonable inspection and conclude that such an inspection, if performed

11  on the playground, would have uncovered the relevant conditions.  *See Coleman*, 853

12  P.2d at 476-79.  Experts from both sides testify that a reasonable playground owner

13  should regularly inspect playground equipment, and should either employ someone with

14  knowledge of playground safety standards or provide to the inspector a checklist or

15  instruction sheet that embodies those standards.  (*See* Wampold Decl. ¶ 2, Ex. 7 "Linville

16  Dep.") at 14:2-15:3, 90:20-95:2; Iverson Dep. at 9:13-10:11, 19:6-18, 30:22-31:3, 62:19-

17  23, 65:3-66:11.)  It is further undisputed that published national playground safety

18  standards require that all equipment be installed and maintained according to the

19  manufacturer's instructions (*see* CPSC Handbook at 9-10; ASTM Standards at 17-19),

20  and that at least 9 inches of appropriate fill should cover the ground beneath a swing like

21  the one at Linden Square (*see* Iverson Report at 1; Linville Dep. 59:8-61:15; CPSC

22  Handbook at 3-6, 9-10; *see also* ASTM Standards at 19).  Ms. Iverson adds that the

1    standard swing height is 16 inches, while 29 inches is too high.  (Iverson Report at 1-2;

2    Iverson Dep. at 42:1-16.)  As such, a jury could reasonably conclude that an adequate

3    inspection would have uncovered improper installation of the swing seat, the seat's

4    height, and insufficient fill material beneath it.  *See Coleman*, 853 P.2d at 476-79; *Kellett*,

5    2013 WL 3242526, at *4.

6         Furthermore, evidence in the record indicates that Essex should have realized that

7    the conditions existing on the playground were dangerous.  *See Kamla*, 52 P.3d at 478.

8    Essex's playground safety expert, Mary Sue Linville, testifies that the swing seat was

9    improperly installed and could cause injury to a child on the ground, and that the

10   inadequate fill beneath the swing posed a risk of death or debilitating injury.  (*See*

11   Linville Dep. at 39:6-16, 50:6-8, 56:17-57:3, 65:8-66:6.)  Professor Green and Ms.

12   Iverson opine that the combination of an improperly installed seat and inadequate fill

13   made the playground dangerous.  (Green Report at 1; *see* Iverson Report at 1-2.)   Based

14   on this evidence and the evidence concerning what a reasonable playground owner

15   should know about playground safety standards, a jury could infer that a reasonable

16   landowner would recognize the Linden Square playground as dangerous.  *See Kamla*, 52

17   P.3d at 478.

18        Essex argues that it could not have had constructive notice because Essex's

19   employees never uncovered a problem despite conducting inspections.  (*See* Mot. at 18-

20   19.)  This argument fails because the record contains evidence indicating that Essex's

21   inspections were unreasonable.  *See Ingersoll*, 869 P.2d at 1015; *Kellett*, 2013 WL

22   3242526, at *4.  Essex does not contest that it did not know about playground safety

1   standards, did not train its employees in those standards, and did not conduct inspections

2   of the playground in accordance with those standards.  (*See* Humiston Dep. at 36:4-22;

3   Mitchell Dept. at 18:14-22.)  Indeed, the record contains little evidence concerning any

4   inspections by Essex.[15]  Essex has no records of performing any maintenance on the

5   swing set outside of repainting it (*see* Humiston Dep. at 23:25-27:10; Mitchell Dep. at

6   13:22-14:3), and the only evidence of repairs to the playground consists of one instance

7   in 2012 when Essex added some fill to the playground (*see* Humiston Dep. at 53:12-

8   54:6).  Even then, however, Essex admits that its purpose was not to address safety

9   concerns but to improve the appearance of the playground by filling in holes left from the

10  removal of a different piece of playground equipment.  (*See id.* at 53:12-55:2.)

11          In sum, Plaintiffs have produced evidence from which a rational jury could

12  conclude that Essex had constructive knowledge of the alleged dangerous condition of

13  the playground.  *See Celotex*, 477 U.S. at 324; *Ingersoll*, 869 P.2d at 1015.  The court

14  therefore denies Essex's motion for summary judgment with respect to this issue.

15  _____

16  [15] Essex states in its submissions to the court that "Essex employees visually inspected
    the swing on a daily basis."  (Mot. at 18 (citing Harrison Dep. at 25:19-23; Subero Dep. at 41:16-
    20).)  In support of this statement, Essex cites to the depositions of Ms. Harrison and Mr. Subero,

17  without an introductory signal such as "*see*."  (*Id.*; *see also id.* at 3 ("Essex employees visually
    inspected the swing on a daily basis.") (citing Harrison Dep. at 25:19-23; Subero Dep. 41:16-

18  20).)  Yet neither Ms. Harrison nor Mr. Subero says in the cited passages that he or she or any
    other Essex employee visually inspected the swing on a daily basis.  (*See* Harrison Dep. at 25:19-

19  23; Subero Dep. at 41:16-20.)  Instead, both state only that they saw children using the swing set.
    (*See id.*)  Neither states how often such sightings occurred or that they were accompanied by an

20  inspection of the swing set.  (*See id.*)

            This is at least the second instance in one brief in which Essex has cited a passage in the

21  record as providing direct support for a proposition that in fact receives no support from the cited
    material.  *See supra* Part III.B (discussing Essex's representations that non-resident children used

22  the swing set).  The court will not tolerate such loose citation practice.  Accordingly, the court
    hereby warns Essex that future instances of similar conduct may result in sanctions.

3.  <u>Proximate cause</u>

Finally, Essex argues that Plaintiffs lack evidence to show that its alleged breach was the proximate cause of Mr. Meng's injury.  (*See* Mot. at 19-24.)  The term "proximate cause" encompasses both cause in fact and legal cause.  *See Hartley v. State*, 698 P.2d 77, 83 (Wash. 1985).  "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury."  *Id.*  This aspect of proximate cause is, as its name indicates, a factual question that is generally left to the jury.  *Id.*  Essex challenges only cause in fact here.  (*See* Mot. at 19-20.)

Essex maintains that there is no evidence that the swing, even if it was unstable and too high above an inadequately protected surface, caused Mr. Meng to fall.  (*See id.* at 20.)  The court disagrees.  The reports and testimony of Professor Green and Ms. Iverson indicate that the swing's instability and height were dangerous and could have caused Mr. Meng to fall.  (*See* Green Report at 1; Green Dep. at 70:25-71:17; Iverson Report at 1-2; Iverson Dep. at 39:6-24.)  In particular, Mr. Green opines that the swing acts as a dump truck when a person sits on it, that this action kicks in immediately when a person sits down, and that the action will tip a person onto the ground if the person is not prepared for it.  (*See* Green Report at 1; Green Dep. at 70:25-71:17.)  Mr. Meng testifies that although he does not know how he fell, he remembers feeling stable but then immediately tumbling backward upon sitting on the swing.  (*See* Meng Dep. at 17:18-23, 20:4-10, 21:17-20.)  Viewing the evidence in the light most favorable to Plaintiffs, a rational jury could find that the swing's instability and height caused Mr. Meng to fall. *See Celotex*, 477 U.S. at 324; *Hartley*, 698 P.2d at 83.

ORDER- 24

1      In addition, Essex contends that Plaintiffs are advancing a legally baseless "loss of

2   chance" theory to the extent Plaintiffs argue that playground conditions caused Mr.

3   Meng's injury even if they did not cause him to fall.  (*See* Mot. at 21-23); *Mohr v.*

4   *Grantham*, 262 P.3d 490, 493-95 (Wash. 2011) (describing the loss-of-chance theory

5   and observing that Washington courts have generally declined to extend it beyond the

6   medical negligence context).  The court rejects Essex's position.  The "loss of chance"

7   theory applies when a medical provider's negligence deprives a patient of the opportunity

8   to recover from a preexisting injury or illness.  *See Mohr*, 262 P.3d at 493-95.  The theory

9   operates on a particular conception of the plaintiff's injury:  the "loss of a chance of a

10  better outcome."  *Id.* at 496.  Here, Mr. Meng's asserted injury is the physical damage he

11  sustained when he hit the ground beneath the swing, not the loss of an opportunity to

12  recover from that or any other injury.  (*See* Compl.)  Viewing the facts in the light most

13  favorable to Plaintiffs, the jury could find that—whatever caused Mr. Meng to fall—Mr.

14  Meng would not have been injured but for the unsafe condition of the playground.  (*See*

15  Ching Report at 5-9 (discussing the mechanics of Mr. Meng's injury and the importance

16  of the height of his fall in that analysis); *see also* Ching Decl. (Dkt. # 27) ¶¶ 2-4.)[16]

17  _____

18      [16] In its reply memorandum, Essex argues that the opinions of Plaintiffs' biomechanical
    expert, Dr. Randal Ching, are unreliable and inadmissible.  (*See* Reply at 10-11.)  Essex did not

19  raise these arguments in its initial motion, despite mentioning Dr. Ching's opinions at several
    points in that document.  (*See, e.g.*, Mot. at 22-23.)  New issues may not be raised in reply briefs.

20  *See Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996).  When a party raises new material in a
    reply brief, the court has discretion to strike that material.  *See, e.g., Tovar v. U.S. Postal Serv.*, 3

21  F.3d 1271, 1273 (9th Cir. 1993).  The court therefore strikes the portion of Essex's reply
    memorandum in which Essex argues that Dr. Ching's opinions are unreliable.  (*See* Reply at 10-

22  11); *Bazuaye*, 79 F.3d at 120.  The court expresses no opinion on the merits of those arguments
    at this time.

1    The court therefore concludes that Essex is not entitled to summary judgment on

2 the issue of proximate cause.  Moreover, because genuine disputes of material fact

3 remain with respect to each of the issues on which Essex moves for summary judgment,

4 the court denies Essex's motion in its entirety.

5                              **IV.    CONCLUSION**

6    For the foregoing reasons, the court DENIES Essex's motion for summary

7 judgment (Dkt. # 19).

8    Dated this 21st day of August, 2015.

9

10

11   _____

12   JAMES L. ROBART
     United States District Judge

13

14

15

16

17

18

19

20

21

22

ORDER- 26